Derbigny, J.
delivered the opinion of the court.* The plaintiff and appellee, a mulatto woman, supposed to be the bastard child of Christopher Beard, deceased, claims a tract of land, now in the possession of the defendant and appellant, which she says was devised to her by her reputed father.
According to the statement of facts, which comes up with the record, it appears that the plaintiff was the slave of one Benjamin Farrar, at the time of Beard’s death : but she alleges that, if certain witnesses whom she offered had been heard, she might have proven that she was *364 born free, was so reputed and had been acknowledged as such by Farrar, before the death of Beard. That evidence having been rejected, her counsel filed a bill of exceptions, upon which it is necessary to pronounce before we proceed further.
From the matter set forth in the bill of exceptions, it appears that before any attempt had been made on the part of the defendant to prove that she is a slave, she introduced in evidence the will of Benjamin Farrar, in which he orders his executors to emancipate her, and afterwards the testimony, which was rejected, in order to shew that she was born free and had been acknowledged as such by Farrar, in the life time of Beard. The district judge thought that by producing the will of Farrar, she had destroyed the presumption of her free birth, and had shewn that she relied on a title to freedom by emancipation, and being of opinion that freedom by emancipation could not be proven by witnesses, he rejected the witnesses proffered.
In both these positions we think that he was mistaken.
If the will of Farrar, produced by the plaintiff, contained nothing else with regard to her, than an expression of his intention, that she should be enfranchised, there would have been *365 some reason to suppose that she relied on it, as her title to freedom, and to consider her as stopped from attempting to prove that she was born free, or that she had been manumitted prior to that will; tho’ it must be confessed this would have been to carry very far the doctrine of estoppel. But the sixth section of the will of Farrar, which the plaintiff read in evidence, contains other particulars concerning her. He there stipulated that her freedom, and the legacy which he leaves her, are in consideration of all and every claim whatever, which she may have to any estate left by Beard, and requires that, upon her arriving to the age of eighteen years, his executors shall take from her a proper discharge therefrom. Here then is another matter mentioned than the emancipation. The plaintiff well may have produced this document, to shew that Benjamin Farrar was himself aware that she had some claim upon the estate of Beard, which Farrar had appropriated to his own use. The mere reading of that clause, therefore, is no evidence that the plaintiff intended to use it as a title to freedom, and ought by no means to have operated as a barrier against the introduction of any proof, which might tend either to shew her free birth or her emancipation anterior to that will.
*366 The plaintiff has offered to evince two facts : first that she was born free, secondly that she was reputed free and acknowleged as such by Farrar, in the life time of Beard. On the admission of any proof of the first fact, the district judge was of opinion that she had herself destroyed the presumption of her free birth, and could not be permitted to establish it by evidence. But, we have already shewn that the introduction of the will of Farrar cannot be interpreted with that rigour. The plaintiff then could produce testimony that she was born free.
As to the other fact, viz. that she was acknowleged free by Farrar, in the life time of Beard, it is said, that as this must mean that she was then emancipated by him, no oral evidence could be admitted in support of that allegation because emancipation must be proven by writing. It is not denied that, by the laws of Spain, slaves could be emancipated verbally, in presence of witnesses: but, it is said, that at the time referred to by the plaintiff, the French law, called the code noir, according to which none but written acts of emancipation were deemed valid, was in force in this country. To establish this, a proclamation is produced, issued by Don Alessandro de O’Reilly, of the 27th of August, 1769, whereby it is continued *367 in force. How far the Spanish officer, who took possession of Louisiana, was authorised to maintain the former laws or introduce the laws of Spain, is a subject on which vain inquiries have often been made here. It is probable he did not deposit among the archives of the province any copy of instructions, or that, if he did, it has disappeared before the country. It was delivered to the government of the United States. We are therefore left to take it for granted that he did not act without authorisation. Admitting then that he had a discretionary power to preserve such of the existing laws as should be deemed fit, it appears that he thought proper on the 27th of August, 1769, that is to say, about a week after he had taken possession, to declare that the French code noir should continue in force. But that this was a measure resorted to on the spur of the moment, in the midst of the storm which then agitated the country, is evident from his subsequent conduct. We see him three months after, when tranquillity was restored and when he could give the necessary attention to the business of legislation publishing in the French language and extract from the whole body of the Spanish law, with references to the books in which they are contained, purporting to be intended for an elementary instruction *368 to the inhabitants of the province; meanwhile the knowledge of the Spanish language should diffuse itself and enable them to read the laws in their original idiom. This publication, followed from that moment by an uninterrupted observance of the Spanish law, has been received as an introduction of the Spanish code in all its parts, and must be considered as having repealed the laws formerly prevailing in Louisiana, whether they had continued in force by the tacit or express consent of government. The observation made by the counsel of the appellant that the French code noir, ordered by O’Reilly to continue in force, could co-exist with the Spanish laws afterwards published, because it contains certain regulations for which the Spanish laws have made no provision, is probably correct. When a law is not absolutely and generally repealed, such of its provisions as are not repugnant with the subsequent laws, do not cease to have effect. On the present question, was there no disposition in the laws of Spain concerning the enfranchisement of slaves, it might be just to pretend that the French code noir ought to be resorted to, but as the reverse is the case we must refuse to consult it.
The witnesses, offered by the plaintiff, ought therefore to have been heard, even upon the fact *369 of emancipation, supposing the testimony tendered such as the law 1, tit. 22, part. 4, does admit. Upon this point, it is true that the plaintiff has not been as explicit as it was her duty to have been : she ought to have shewn her readiness to prove such emancipation as is valid by that law, that is to say, an enfranchisement before five witnesses. The manner in which she tendered her proof, did not shew that, but rather raised a suspicion that she was not able to prove so much. Yet, as it did not exclude all probability that she may evince what the law requires, she ought to have been permitted to introduce her witnesses.
The plaintiff, notwithstanding the rejection of that evidence, had judgment in her favour in the inferior court, and did we agree with the district judge on the merits of the case, it would be unnecessary to send it back. But, being of opinion that as the case now stands, she ought not to recover, we are obliged to remand it.
It is adjudged, ordered and decreed, that the judgment of the district court be reversed, both as to the principal demand and as to the warranty, and that the case be remanded to the district court, with instructions to the judge to admit any legal evidence, which the plaintiff *370 may offer in support of the allegations contained in her bill of exceptions.

 Martin, J. did not join in this opinion, having been of counsel in the case.